Alixandra C. BAKER, Plaintiff,

v.

LANSDELL PROTECTIVE AGENCY, INC. and British Airways, Defendants.

LANSDELL PROTECTIVE AGENCY, INC., Third-Party Plaintiff,

v.

MIDLAND INSURANCE COMPANY, Third-Party Defendant.

No. 83 Civ. 7577 (WCC).

United States District Court, S.D. New York.

June 26, 1984.

Chadbourne, Parke, Whiteside & Wolff, New York City, for plaintiff; James C. LaForge, Linda J. Chase, New York City, of counsel.

Abberley, Kooiman, Marcellino & Clay, New York City, for defendant Lansdell, Protective Agency Inc.; Richard Hagouel Langsam, New York City, of counsel.

## OPINION AND ORDER

CONNER, District Judge.

Plaintiff Alixandra C. Baker ("Baker") commenced the instant action seeking to recover the value of certain jewelry she claims was removed from her hand luggage while she passed through a security checkpoint, manned by employees of defendant Lansdell Protective Agency, Inc. ("Lansdell") prior to boarding a British Airways flight from Kennedy Airport in New York to London, England. Baker alleges that approximately $200,000 worth of jewelry disappeared from her bag between the time she handed the bag to a security agent for passage through an X-ray scanner and the time the bag was returned to her on the other side of the screening area. She did not discover the alleged loss, however, until after her arrival in London. The case is currently before the Court on Lansdell's [1] motion for partial summary judgment (1) limiting its liability to $400 based upon the limitation imposed by the Warsaw Convention or, alternatively, by the terms of the passenger ticket, and (2) dismissing those causes of action which purport to hold Lansdell liable for the alleged conversion of the jewelry by its employees. For the reasons stated below, the motion is granted in part.

### I. *Warsaw Convention*

■ The Warsaw Convention ("Convention"),[2] like all international treaties validly executed by this country, represents the law of the land, *see Reed v. Wiser*, 555 F.2d 1079, 1093 (2d Cir.), *cert. denied*, 434 U.S. 922, 98 S.Ct. 399, 54 L.Ed.2d 279 (1977); *O'Rourke v. Eastern Air Lines, Inc.*, 553 F.Supp. 226, 228 (E.D.N.Y.1982), " 'equal in stature and force to the domestic laws of the United States.' " *In re Air Craft Dis-*

*aster at Warsaw, Poland*, 705 F.2d 85, 87 (2d Cir.1983), *quoting Smith v. Canadian Pacific Airways, Ltd.*, 452 F.2d 798, 801 (2d Cir.1971). As such, it preempts all local law to the contrary. *O'Rourke*, 553 F.Supp. at 228; *Husserl v. Swiss Air Transport Co.*, 351 F.Supp. 702, 706 (S.D. N.Y.1972), *aff'd per curiam*, 485 F.2d 1240 (2d Cir.1973).

By its terms, the Convention applies "to all international transportation of persons, baggage or goods performed by aircraft for hire." Convention, art. 1, § 1. Essentially, it creates a presumption of liability on the part of an air carrier in certain situations for injury, death, or property damage, without proof of fault but subject to a concomitant limitation of liability. *Day v. Trans World Airlines, Inc.*, 393 F.Supp. 217, 221 (S.D.N.Y.), *aff'd*, 528 F.2d 31 (2d Cir.1975). It thus operates to redistribute the costs connected with air transportation. *Id.* at 220.

■ Under the Convention, a carrier is charged with liability up to the sum of 125,000 francs for personal injuries suffered by a passenger "if the accident which caused the damage so sustained took place on board the aircraft or *in the course of any of the operations of embarking* or disembarking." Convention, ch. III, art. 17 (emphasis added). The Convention also places a *ceiling of 5,000 francs*, or approximately $400, on a carrier's liability for "objects of which the passenger takes charge himself" without expressly defining the scope of the carrier's responsibility for the loss of or damage to such objects. *See id.* at art. 22, § 3. However, because it is envisioned that these objects will ordinarily be within the passenger's possession or control, it is both logical and consistent with the Convention's overall framework to interpret the scope of the Convention's applicability to these items as being coextensive with its coverage of injuries to the person. Indeed, because there is no indica-

---

1. Plaintiff and British Airways stipulated to the discontinuance of plaintiff's claim against British Airways.

2. 49 Stat. 3000 (codified at note to 49 U.S.C.A. § 1502).

tion that the scope of a carrier's responsibility for a passenger's personal effects is intended to be otherwise than the extent of its responsibility for the passenger's person, the Convention must be read as applying only to the loss of or damage to these personal items which occurs on board the aircraft or in the course of any of the operations of embarking or disembarking.

Moreover, the Convention also imposes liability upon a carrier for the loss of or damage to checked baggage or goods, subject to a limitation of 250 francs per kilogram, if the loss or damage occurs while the bag is in the custody of the carrier. *See id.* at art. 18, §§ 1–2, and art. 22, § 2. A carrier is, however, disabled from availing itself of the 250-franc-per-kilogram liability limitation if it fails to provide the passenger with a baggage check conforming to the requirements of the Convention. *See id.* at art. 4, § 4. In addition, a carrier is not permitted to take advantage of any of the liability limitations contained in the Convention if the passenger can demonstrate that the damage was caused by the carrier's willful misconduct or by the willful misconduct of any agent of the carrier acting within the scope of his employment. *See id.* at art. 22, § 1 and art. 25, §§ 1 and 2.

As an initial matter, Baker and Lansdell disagree concerning how properly to characterize the bag from which the jewelry was allegedly stolen for purposes of the Convention. Lansdell argues that the bag and its contents are properly considered property over which the passenger took charge, and thus that Lansdell's liability must be limited to $400 absent a showing of willful misconduct. Conversely, Baker contends that her carry-on bag is appropriately classified as checked baggage for the period of time it was in the hands of Lansdell employees for purposes of a pre-boarding security check. She further asserts that because she was not given a baggage

check when she turned her bag over to the security guard, the Convention's limitations on liability cannot be relied upon even if the Court rules that the Convention is otherwise applicable to occurrences at the security checkpoint.

■■ Quite frankly, I am unpersuaded by plaintiff's argument, which in essence would require a carrier to provide a baggage check for each item it subjects to a brief, pre-boarding X-ray examination in order to retain its liability protection under the Convention. This limited exercise of momentary, and arguably inexclusive, dominion over property of which a passenger has otherwise taken charge does not bring the property within the ambit of Article 4 of the Convention.[3] Rather, the essential condition that triggers a carrier's obligation to issue a baggage check is that the carrier "accept" the bag for purposes of transportation. Thus, so long as the carrier has taken control over the carriage of the bag, the provisions of Article 4 will apply regardless of whether the baggage is accepted in the normal course prior to boarding or is instead taken from the passenger by the carrier or its agent after the passenger has already boarded the aircraft. *See Hexter v. Air France*, 563 F.Supp. 932, 935 (S.D.N.Y.1982); *Schedlmayer v. Trans Int'l Airlines*, 99 Misc.2d 478, 416 N.Y.S.2d 461, 466 (Civ.Ct.1979). However, where, as here, the passenger only briefly relinquishes physical possession of her hand-carried property for a necessary security check conducted in her presence, but retains responsibility for the transportation of that property, Article 4 does not apply. Accordingly, I conclude that plaintiff's failure to receive a baggage check at the security counter for the handbag from which she claims her jewelry was removed does not strip Lansdell of the liability limitations of the Convention to the extent that those limitations are otherwise applicable.

---

**3.** It should be noted that if carried to its logical extreme, plaintiff's argument would require the issuance of a baggage check every time a carrier's agent takes physical control of a passenger's property, including, presumably, those routine situations in which a flight attendant takes temporary possession of a passenger's carry-on luggage while assisting the passenger into his seat. Such a result would obviously be unworkable.

The central issue on this motion is really whether the Convention applies to incidents occurring while a passenger is in a pre-boarding security area. To resolve this question, the Court must determine whether Baker was "in the course of any of the operations of embarking" at the time the jewelry was allegedly removed from her bag. If so, then her recovery will be limited to $400, absent a showing that the loss was caused by the willful misconduct of Lansdell or one of its employees acting within the scope of his employment.[4]

■ In *Day v. Trans World Airlines, Inc.*, 528 F.2d 31 (2d Cir.1975), *cert. denied*, 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976), *reh'g denied*, 429 U.S. 1124, 97 S.Ct. 1162, 51 L.Ed.2d 574 (1977), the Second Circuit was required to analyze for the first time whether a passenger can be considered in the course of any of the operations of embarking while still inside the terminal building. In rejecting a mechanistic, location-based approach advocated by the airline, under which Article 17 of the Convention would not apply until the passenger stepped through the terminal gate, the court embraced the reasoning of Judge Brieant of this Court and adopted a three-part test for determining when one is in the course of any of the operations of embarking. The factors considered under this test include: (1) the nature of the activity the passenger was engaged in; (2) under whose control or at whose direction the passenger was doing it; and (3) the location of the activity. *Id.* at 33; *see Evangelinos v. Trans World Airlines, Inc.*, 550 F.2d 152, 155 (3d Cir.1977) (*en banc*) (adopting standard based upon same three factors); *see also Maugnie v. Compagnie Nationale Air France*, 549 F.2d 1256, 1262 (9th Cir.), *cert. denied*, 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977) (location but one of several factors to be considered).

Although *Day*, *Evangelinos*, and *Maugnie* each arose in the context of an attempt by a plaintiff to invoke the Convention in order to impose liability on a carrier, rather than, as in the instant case, where a defendant seeks to take advantage of the Convention for purposes of limiting its liability, the difference is not significant. The Second Circuit in *Day*, and the Third and Ninth Circuits in *Evangelinos* and *Maugnie*, respectively, adopted multi-factored approaches to the question of the scope of the operations of embarking, based upon their analyses of the language of the Convention and its "legislative" history. *See Evangelinos*, 550 F.2d at 157–58; *Maugnie*, 549 F.2d at 1260–62; *Day*, 528 F.2d at 33–38. The Second Circuit in particular determined that subjective consideration of the three factors best effectuates the intent of the Convention's draftsmen to create a system of international air law flexible enough to keep pace with evolutionary changes in the nature of civil air travel. *See id.* at 38. Accordingly, if it is determined after due consideration of the relevant factors that an incident occurred during one of the operations of embarking, then all applicable conditions of the Convention must be given effect, including both the terms that create automatic liability and the concomitant terms that limit the liability created.

■ Applying the three-part test endorsed in *Day*, I conclude that Baker was engaged in one of the operations of embarking at the time her jewelry was allegedly stolen. By federal statute, "all passengers and all property intended to be carried in the aircraft cabin" must be screened for weapons prior to boarding. 49 U.S.C. § 1356(a) (West 1976); *see* 14 C.F.R. §§ 108.1 to 108.25 (Jan. 1983). Although the security checkpoint at which Baker and her carry-on baggage were screened for weapons was not located immediately at the flight gate, it was located in an area to which only passengers, and not the general public, were permitted access. As Baker herself testified at her deposition: "You had to walk up a relative-

---

**4.** For the reasons stated *infra*, I have concluded that Lansdell is entitled to rely upon those pro-

tections of the Convention afforded to a carrier.

ly steep ramp. At the bottom of that ramp was a security agent who checked boarding passes. We then proceeded up the ramp to the security check." Baker Dep. Tr. at 74.

Moreover, throughout the course of the security check Baker was under the direction of defendants' employees. Baker testified that upon reaching the security checkpoint she was instructed by a security person to "put your bags down here [on the table] and walk on through." *Id.* at 76. After she placed her bags down they were "shoved" through the X-ray machine by the security guard, *id.* at 79, and she followed his instructions and walked through the magnetometer. *Id.* at 90. The whole procedure, from the time Baker and her husband arrived at the security checkpoint until the time they emerged on the opposite side of the magnetometer, took less than one minute. *See id.* at 78. Under these circumstances, where Baker was engaging in an activity which is a legally mandated prerequisite to boarding an airplane, where she was undergoing the required security check at the express direction of defendants' employees and in a part of the terminal restricted to passengers with tickets, it is appropriate to characterize Baker as being in the course of one of the operations of embarking. Thus, in view of my prior determination concerning the scope of the Convention's coverage of property of which the passenger takes personal charge, the $400 liability limitation applies to the loss alleged by Baker in her complaint.

■ The one remaining issue is whether Lansdell may be permitted to take advantage of the Convention's limitations on liability, which by their terms apply only to air carriers. In *Reed v. Wiser,* the Second Circuit ruled that a carrier's employees were protected by the Convention to the same extent as the carrier itself. *See* 555 F.2d at 1093. The court reasoned that a contrary holding, which would allow a suit for unlimited damages against a carrier's employees, would undermine the purposes of the Convention because in most instances carriers are bound to provide their employees with indemnity protection. *See id.* at 1089–90. Such a result would obviously upset the intended balancing of the incidence of air transportation costs which the Convention was designed to provide. Similarly, in *Julius Young Jewelry Mfg. Co., Inc. v. Delta Air Lines,* 67 A.D.2d 148, 414 N.Y.S.2d 528 (1979), the Appellate Division, First Department adopted the reasoning of *Reed* in holding that "the liability limitations of the Convention apply to an air carrier's agent performing functions the carrier could or would ... otherwise perform itself." 414 N.Y.S.2d at 530. The court in *Julius Young* affirmed the entry of partial summary judgment limiting the liability of Allied, "an independent contractor engaged by defendant Delta and other airlines to perform inter-line baggage transfer services," to the limit imposed by the Convention. *Id.* at 529.

Here, Lansdell asserts that it is an agent of British Airways and thus, like the agent in *Julius Young,* it is entitled to avail itself of the liability protection afforded by the Convention. In connection with this contention, it must be noted that 49 U.S.C. § 1356 requires that security checks, such as the one during which the alleged loss purportedly occurred in the instant case, be performed by employees or agents of the air carrier. Therefore, unless British Airways and Lansdell are violating the law, Lansdell is entitled to invoke the liability limitations of the Convention. Moreover, consistent with ordinary expectations and the statutory requirement, Frank C. McRoberts, III, Vice-President of Lansdell, stated in an affidavit submitted in support of the instant motion that Lansdell had an agreement with British Airways to provide the security services at issue here. *See* McRoberts Aff. at ¶ 4.

In the face of this evidence, Baker does not deny the existence of a contractual relationship between Lansdell and British Airways. Rather she argues only that she needs additional discovery in order to ascertain the true nature of that relationship. However, it is hard to imagine what plaintiff could possibly demonstrate if she were to undertake further discovery. The uncontroverted fact that Lansdell had an agreement with British Airways to perform a service, falling within the scope of the

Convention, that British Airways would otherwise be required by law to perform itself is dispositive of the issue. The precise nature of the parties' arrangement is not material under *Reed* and *Julius Young* to Lansdell's right to avail itself of the liability protections of the Convention. Under these circumstances, to withhold decision to allow further discovery into the technical aspects of the Lansdell/British Airways relationship is simply unjustified.

Accordingly, for the reasons stated above, Lansdell's motion for partial summary judgment limiting its liability to $400 is granted subject to plaintiff's opportunity to demonstrate at trial that her loss occurred as a result of Lansdell's willful misconduct or of the willful misconduct of one of Lansdell's employees acting within the scope of his employment. Because I conclude that the Convention applies, I need not reach those aspects of Lansdell's motion that concern Baker's state law claims. So long as Baker can demonstrate that the alleged loss occurred during the security check, she will establish the liability of Lansdell subject to the limitation discussed above. State law theories of liability are therefore irrelevant or, to the extent they impose greater liability on Lansdell, preempted by the Convention.

SO ORDERED.